Charles C. Gokey, CA Bar No. 295610
cgokey@engstromlee.com
ENGSTROM LEE LLC
323 N Washington Ave., Suite 200
Minneapolis, MN 55401
T. (612) 305-8349; F. (612) 677-3050
*Counsel for Plaintiff*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### SOUTHERN DIVISION

| | |
|---|---|
| Gustavo Moran, as the representative of a class of similarly situated persons, and on behalf of the Aluminum Precision Products, Inc. Employee Stock Ownership Plan,<br><br>Plaintiff,<br><br>v.<br><br>ESOP Committee of the Aluminum Precision Products, Inc. Employee Stock Ownership Plan,<br><br>Defendant. | Case No. 8:24-cv-00642-MWF-ADS<br><br>**AMENDED CLASS ACTION COMPLAINT**<br><br>(1) Violations of Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001 *et seq.* |

## NATURE OF THE ACTION

1.    Plaintiff Gustavo Moran ("Plaintiff"), as the representative of the Class described herein, and on behalf of the Aluminum Precision Products, Inc. Employee Stock Ownership Plan (the "ESOP"), brings this action pursuant to the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001 *et seq.* ("ERISA"), against the ESOP Committee of the Aluminum Precision Products, Inc. Employee Stock Ownership Plan (the "ESOP Committee" or "Defendant"). This case is about Defendant's failure to invest the non-employer stock assets of the ESOP prudently and for the exclusive benefit of ESOP participants. The foregoing violated Defendant's fiduciary duties under ERISA, 29 U.S.C. §§ 1104(a)(1) and 1106(a).

## PARTIES

2.    The ESOP is an "employee pension benefit plan" within the meaning of 29 U.S.C. § 1002(2)(A); a "defined contribution plan" as defined by 29 U.S.C. § 1002(34) (also known as an "individual account plan"); and an "employee stock ownership plan" as defined by 29 U.S.C. § 1007(d)(6). The ESOP is sponsored by Aluminum Precision Products, Inc. ("APP") for the benefit of its employees.

3.    Plaintiff Gustavo Moran is a natural person and a resident of Perris, CA. He is a current participant in the ESOP. He worked for APP between 2008 and 2021. He is at least 20 years from retirement age and does not currently have sufficient assets set aside to support himself through retirement. His ESOP benefit is determined by the value of his *pro rata* share of ESOP assets. During the relevant time, around 20%-25% of his ESOP account was invested, at Defendant's direction, in cash equivalents and short-term treasury bonds. His ESOP benefit would be worth more if not for Defendant's violations of ERISA. Specifically, the portion of Plaintiff's ESOP account invested by Defendant in cash equivalents and short-term treasury bonds would have received higher investment earnings, and would be worth

-1-

more today, if it had been invested according to a prudent process, including but not limited to being invested in the funds identified in Paragraphs 67-68, *infra*.

4. Defendant is the ESOP's governing committee established by the written terms of the ESOP. Defendant directs the ESOP's trustee with respect to how to invest ESOP assets. Accordingly, Defendant is a fiduciary of the ESOP pursuant to 29 U.S.C. § 1002(21)(A)(i).

5. Upon information and belief, Defendant is comprised of senior executives of APP.

## JURISDICTION AND VENUE

6. Plaintiff brings this action pursuant to 29 U.S.C. §§ 1132(a)(2) and (3), which provide that a participant in an employee benefit plan may pursue a civil action on behalf of the plan to remedy violations of ERISA and obtain monetary and appropriate equitable relief.

7. This case presents a federal question under ERISA and therefore this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1).

8. Venue is proper in this district pursuant to 29 U.S.C. § 1132(e)(2) because Defendant's violations of ERISA occurred in Santa Ana, CA, where APP is located and where the ESOP is administered.

## DEFENDANT'S VIOLATIONS OF ERISA

### *History of the ESOP and its Other Investments Account*

9. APP established the ESOP in 2009 to provide retirement benefits to employees. There are around 800 participants in the ESOP.

10. Each participant's ESOP benefit is determined by the value of their individual account.

-2-

11. The ESOP has two types of assets: APP stock and other investments. The other investments are known as the "Other Investments Account" (hereinafter "OIA").

12. Each participant's account value is their *pro rata* share of the ESOP's total asset value. Participants are credited with a share of company contributions and APP stock allocations while employed by APP. Participant credits are then adjusted over time by investment gains, losses, and income received by the ESOP with respect to its APP stock and OIA investments.

13. The ESOP purchased APP stock in two transactions in 2011 and 2012. Between 2012 and 2017, the ESOP owed APP a note that was used to finance the ESOP's acquisition of APP stock. The APP shares purchased by the ESOP served as collateral for the note.

14. The ESOP used cash contributions and APP stock dividends to satisfy the note in full between 2012 and 2017, which resulted in all of the ESOP's APP shares being released from the collateral account and allocated to participant accounts.

15. Since 2017, the ESOP has continued to receive cash contributions and dividends. Because the ESOP has fully satisfied its acquisition debt for APP shares, these contributions and dividends have accumulated in the OIA.

### *Defendant's Investment of the ESOP's Other Investments Account*

16. Participants have no control over the investment of the OIA and rely on Defendant to prudently invest the OIA funds.

17. Between 2018 and 2022, the OIA averaged around $5.5 million. At the end of 2022, the balance was over $6 million.[1]

18. At all times, Defendant has kept the OIA invested exclusively in assets on the lowest end of the risk-return spectrum. Between 2018 and 2021, Defendant

---

[1] Total ESOP assets, including APP stock, were around $28 million.

-3-

invested the entire OIA balance in a money market fund. In 2021, Defendant moved around half the OIA balance to a fund that invests in short-term U.S. treasury bonds, keeping the remainder in a money market fund.

### *The Prudent Investor Rule*

19. ERISA fiduciaries must follow the "prudent investor rule" adopted from the law of trusts. *Buccino v. Cont'l Assur. Co.*, 578 F. Supp. 1518, 1521 (S.D.N.Y. 1983) ("[The] common law prudent investor' rule [was] codified by ERISA.").

20. Pursuant to the prudent investor rule, fiduciaries must invest plan assets in a manner that is "reasonably designed to further the purposes of the plan, taking into consideration the risk of loss and the opportunity for gain." 29 C.F.R. § 2550.404a-1(b)(2)(i); *see also* Restatement (Third) of Trusts (2007) (hereinafter "3d Rest.") § 90(a) (fiduciaries must pursue "an overall investment strategy[] which … incorporate[s] risk and return objectives reasonably suitable to the trust.").

21. The prudent investor rule departs from earlier understandings of prudence that overemphasized risk avoidance. *See* 3d Rest. § 90 cmts. a & k ("[T]he prudent investor rule is "an extension and clarification of the traditional … 'prudent man rule,'" pursuant to which "[b]road categories of properties and techniques came to be branded as 'speculative' [and] … classified as 'impermissible'"); *see also id.*, Reporter's Note to cmt. e. ("'[S]afety' of the funds invested was often identified as 'the primary object to be obtained by a trustee' under traditional doctrine[.]").

22. Rather than avoid risk, fiduciaries must manage risk in pursuit of the objectives of the plan. *See* Max M. Schanzenbach, *et al.* "The Prudent Investor Rule and Market Risk: An Empirical Analysis." Journal of Empirical Legal Studies Volume 14, Issue 1, 129:168, 130 (March 2017) ("The prudent investor rule … reorients trust investment from risk avoidance to risk management[.]").[2]

---

[2] Available at www.aals.org/wp-content/uploads/2018/02/AM17PrudentInvestorRuleandMarketRisk.pdf (last visited June 28, 2024).

-4-

23.    An appropriate investment strategy suited to the objectives of the plan must consider the time horizons and needs of beneficial investors. *See* 29 C.F.R. § 2550.404a-1(b)(4) ("A fiduciary's determination with respect to an investment" must "us[e] appropriate investment horizons consistent with the plan's investment objectives."); *see also* 3d Rest. § 90 cmt. k ("Asset selection … requires sensitivity to the trust's investment time horizons[.]").

24.    A plan's risk tolerance "largely depends" on how long funds will be held. *Id.* cmt. e(1).

25.    The prudent investor rule prohibits fiduciaries from considering any interests other than the interests of beneficiaries. *Id.* cmt c (stating that the duty of loyalty "prohibit[s] … investing in a manner that is intended to serve interests other than those of the beneficiaries"). A fiduciary may not "sacrifice investment return" to serve their own interests. *See* 29 C.F.R. 2550.404a-1(c)(1); *see also Bussian v. RJR Nabisco, Inc.*, 223 F.3d 286, 298 (5th Cir. 2000).

26.    While "there are endless variations in reasonable strategies for investing and for the prudent management of risk," a fiduciary's investment approach "must be reasonably supported in concept and must be implemented with proper care, skill, and caution." *See* Rest. 3d § 90 cmts f & h.

27.    Whether a fiduciary satisfied its duty is a test of conduct and process. *Id.* cmt (e)(1) ("The test of prudence is one of conduct, not one of performance."). Courts consider whether fiduciaries "employed the appropriate methods to investigate the merits of the investment." *Donovan v. Mazzola*, 716 F.2d 1226, 1232 (9th Cir. 1983).

### *The ESOP's Objectives and Tolerance for Risk*

28.    APP chose to structure the ESOP as a retirement plan.

29.    Employee retirement plans are generally long-term investments. *See* 72 Fed. Reg. 60452, 60463 (finding that retirement investments made on behalf of employees "ought to and often will be long-term investments").

-5-

30.    Due to being structured as a retirement benefit, ESOP participants suffer an extra 10% penalty tax to use their accounts before reaching retirement age, in addition to having the entirety of any withdrawal taxed as income. *See* 26 U.S.C. § 72(t).

31.    ESOP participants are further encouraged to hold their ESOP accounts until retirement by deferral of tax on account contributions and investment earnings. *See* 26 U.S.C. § 501(a).

32.    The average U.S. worker at any given time is around 20 years or more from retirement age. *See* U.S. Bureau of Labor Statistics. "Employment Projections: Median age of the labor force, by sex, race and ethnicity."[3]

33.    The average U.S. worker is unprepared for retirement. *See* National Institute on Retirement Security. "Statement before the Senate Committee on Health, Education, Labor, and Pensions" at 3. (Feb. 28, 2024) ("The data indicate that most Americans, particularly middle-class workers, are falling far short when it comes to saving enough money for a financially secure retirement.").[4] The shift from defined benefit to defined contribution plans like the ESOP has left a substantial retirement readiness deficit in the U.S. *See id.* at 5.

34.    On information and belief, the average APP worker is similar to the average U.S. worker in terms of years from retirement and lack of retirement readiness. APP employs workers of all ages. APP does not offer a defined benefit plan. While APP offers a second defined contribution plan, the average participant's account balance between the two plans is less than $140,000. At current levels, participants' accounts will not provide sufficient retirement income. *See* PwC. "Retirement in America: Time to rethink and retool" at 4. (2021) (finding that

---

[3] Available at www.bls.gov/emp/tables/median-age-labor-force.htm (last visited June 28, 2024).

[4] Available at https://www.nirsonline.org/wp-content/uploads/2024/02/FINAL-Senate-Written-Testimony-Feb-2024.pdf

-6-

$120,000 is "hardly enough even without factoring in rising life expectancies and increasing healthcare costs.").[5]

35.    Generally, APP employees work because they need regular income to support themselves and their families. The typical APP employee does not have generational wealth or other assets set aside sufficient to support themselves in retirement.

36.    Based on the foregoing, ESOP participants have a long investment horizon and need their account values to grow in order to generate more retirement income. This means that ESOP participants have a high tolerance for risk associated with short-term market volatility and need an investment strategy focused on long-term capital appreciation.

37.    Considerations specific to the ESOP's function as an employee stock plan do not alter the above conclusion.

38.    First, investing in employer stock through a retirement plan is intended to be a long-term investment that appreciates over the course of an employee's career. The overall focus of the ESOP on company stock bolsters the conclusion that ESOP assets should be invested for the purpose of providing long-term capital appreciation to participants.

39.    Second, the ESOP's potential to engage in "recycling" transactions involving APP shares does not shift the investment focus of the OIA. In a recycling transaction, the ESOP transfers shares between departing participants and current participants by exchanging current participants' OIA funds for departing participants' APP shares.

40.    Recycling transactions are entirely voluntary for the ESOP, as it is the company that is liable to repurchase shares from departing participants, not the

[5] Available at https://www.pwc.com/us/en/industries/asset-wealth-management/assets/pwc-retirement-in-america-rethink-retool.pdf.

ESOP. *See* 26 U.S.C. § 409(h)(1)(B); 29 C.F.R. § 2550.408b-3(j). The ESOP may purchase the shares using the OIA if it deems it to be in the interest of current participants to do so at the time.

41.    A desire to repurchase company shares from departing participants using OIA funds (assuming it is in participants' interests) could theoretically shorten the time horizon for use of OIA funds. It depends on how much is needed, and when it is needed.

42.    In this case, prospective recycling transactions do not alter the time horizon or investment strategy for OIA funds because Defendant could not reasonably conclude that the funds are likely to be used in recycling transactions in the short term.

43.    Defendant has consistently funded recycling transactions in whole or substantial part using new contributions and dividends. The funds that remain in the OIA year-to-year are excess funds that were not used in recycling transactions. If Defendant projected future contributions, dividends, and recycling transactions based on prior experience, it would conclude that the bulk of the OIA balance is unlikely to be used in recycling transactions and will remain with participants for the long term. The conclusion that a long-term capital appreciation strategy is needed would prevail.

44.    Additionally, allocating OIA funds to a long-term investment strategy does not make them unavailable for potential future recycling transactions or other purposes. Pooled funds with both long- and short-term investment objectives that will settle customer withdrawals in cash within days (or the same day) are equally available for Defendant to purchase. As a result, equity and bond investments held in mutual funds or exchange-traded funds—the most common vehicles used for OIA accounts—offer materially the exact same liquidity as cash investments.

45.    The difference between short- and long-term funds is in the risk that participants will have lost buying power at the point of exchange. If the fund is

-8-

exchanged long after it was purchased, the risk of loss of buying power is greater with the short-term fund. *See* Rest. 3d § 90 cmt. l ("[A] primary and proper attraction of common stocks [for long-term appreciation] is that they offer trustees a hedge against loss of purchasing power."). If the liquidation occurs shortly after the fund was purchased, the risk of loss of buying power is greater with the long-term fund. *See id.* The choice is not all-or-nothing. A proper risk management decision must be made based on when the funds are more likely to be liquidated. Since the OIA funds are likely to be held for the long term—even if they could eventually be liquidated to complete a recycling transaction—a long term strategy is needed.

46.    Third, the ESOP's risk associated with its large concentration in a single security (APP stock) does not change the time horizon or investment objective for OIA funds. The risk of loss associated with a specific security is known as "specific" or "nonmarket" risk, as opposed to "market" risk, which is the risk associated with vagaries in the market for such a security generally. *See id.* cmt. e.

47.    While it is appropriate to manage specific risk in one part of the portfolio through investments in another part of the portfolio, concern for specific risk does change the underlying investment time horizon or objective for the other funds to be invested. Rather, specific risk is managed by owning different securities of similar character. *See id.* gen. note to cmts. e-h (investing in "multiple stocks" instead of "a single stock" will "reduce[] … the firm specific … risk"). Accordingly, the way to reduce the risk that participants' accounts suffer large losses in APP stock is not to stick the rest of its assets under a mattress where it cannot grow—it is to invest in other stocks, whose gains can help offset losses in the employer's stock.

### *Mismatch Between Strategy and Purpose*

48.    Defendant's investment of the OIA is not suited to the ESOP's long-term capital appreciation objective and tolerance for risk.

-9-

49.     At all times since the ESOP began accruing an OIA balance, Defendant has invested the OIA exclusively in money market funds or a short-term treasury bond fund. Money market funds are cash equivalents, and short-term treasury bond funds invest in government securities with durations of 1-3 years. These assets are suited to short-term investment objectives. *See* Rest. 3d § 90 cmt l. (stating that money market funds and short-term treasury funds are "useful in making modest amounts of trust funds productive for limited periods of time").

50.     In contrast, when an investor's objective is long-term capital appreciation, it is proper to invest in stocks. *See id.* ("Historically, corporate stocks have provided greater total return over the long term … [and] contribute to a deliberate effort to increase the real value of the trust estate."). Defendant has not invested any OIA funds in stocks.

51.     Indeed, Defendant's strategy has effectively guaranteed that the ESOP and its participants will suffer negative real rates of return. Defendant has kept the OIA funds invested in short-term assets that have had lower rates of return than the rate of inflation over the last 20 years. This means that, over time, the OIA funds are likely to depreciate in real value, and the retirement savings of ESOP participants will shrink. This is akin to Defendant simply hiding the OIA funds under a mattress.

52.     As illustrated below, long-term asset class returns measured at any time during the last six years are consistent with the assumptions of the prudent investor rule. Cash equivalents and short-term bonds have generated the lowest long-term average returns. Stock have generated the highest.

53.     By investing exclusively in short-term assets with the lowest long-term returns, Defendant has failed to tailor its OIA strategy to ESOP participants' time horizon and risk tolerance.

-10-

*Major Asset Classes, 10-Year Average Annual Returns, 2018-2023*[6]

| 2018 10-Year Avg. Ann. Return | 2019 10-Year Avg. Ann. Return | 2020 10-Year Avg. Ann. Return | 2021 10-Year Avg. Ann. Return | 2022 10-Year Avg. Ann. Return | 2023 10-Year Avg. Ann. Return |
|---|---|---|---|---|---|
| Mid Cap Stocks | Large Cap Stocks | Large Cap Stocks | Large Cap Stocks | Large Cap Stocks | Large Cap Stocks |
| *13.68%* | *13.56%* | *13.88%* | *16.55%* | *12.56%* | *12.03%* |
| Large Cap Stocks | Mid Cap Stocks | Mid Cap Stocks | Mid Cap Stocks | Mid Cap Stocks | Mid Cap Stocks |
| *13.12%* | *12.72%* | *11.51%* | *14.20%* | *10.78%* | *9.27%* |
| Small Cap Stocks | Small Cap Stocks | Small Cap Stocks | Small Cap Stocks | Small Cap Stocks | Small Cap Stocks |
| *11.97%* | *11.83%* | *11.20%* | *13.23%* | *9.01%* | *7.16%* |
| High Yield Corp Bonds | Long-Term Corp Bonds | Long-Term Corp Bonds | International Stocks | International Stocks | High Yield Corp Bonds |
| *11.12%* | *7.99%* | *8.24%* | *7.84%* | *4.59%* | *4.60%* |
| Long-Term Corp Bonds | High Yield Corp Bonds | Long-Term Treasury Bonds | High Yield Corp Bonds | High Yield Corp Bonds | International Stocks |
| *7.40%* | *7.57%* | *7.80%* | *6.83%* | *4.03%* | *4.32%* |
| International Stocks | Long-Term Treasury Bonds | High Yield Corp Bonds | Long-Term Corp Bonds | Long-Term Corp Bonds | Long-Term Corp Bonds |
| *6.24%* | *7.01%* | *6.80%* | *6.42%* | *2.13%* | *3.88%* |
| Interm-Term Corp Bonds | International Stocks | International Stocks | Long-Term Treasury Bonds | Interm-Term Corp Bonds | Interm-Term Corp Bonds |
| *4.84%* | *5.32%* | *5.19%* | *4.51%* | *1.75%* | *2.46%* |
| Long-Term Treasury Bonds | Interm-Term Corp Bonds | Interm-Term Corp Bonds | Interm-Term Corp Bonds | Ultra Short-Term Bonds | Long-Term Treasury Bonds |
| *4.09%* | *4.25%* | *4.18%* | *3.53%* | *0.91%* | *2.28%* |
| Short-Term Bonds | Short-Term Bonds | Short-Term Bonds | Short-Term Bonds | Short-Term Bonds | Ultra Short-Term Bonds |
| *1.52%* | *1.52%* | *1.60%* | *1.39%* | *0.88%* | *1.40%* |
| Ultra Short-Term Bonds | Ultra Short-Term Bonds | Ultra Short-Term Bonds | Ultra Short-Term Bonds | Cash Equivalents | Short-Term Bonds |
| *0.54%* | *0.74%* | *0.81%* | *0.79%* | *0.76%* | *1.27%* |
| Cash Equivalents | Cash Equivalents | Cash Equivalents | Cash Equivalents | Long-Term Treasury Bonds | Cash Equivalents |
| *0.37%* | *0.58%* | *0.64%* | *0.63%* | *0.60%* | *1.25%* |

## *The Conduct of Similarly Situated Fiduciaries*

54.    Most employee stock plan fiduciaries in a similar position do not invest OIA funds exclusively in short-term assets.

55.    Employee stock plans do not need large reserves of short-term assets to function. Most ESOPs do not hold more than a *de minimis* amount of cash

---

[6] Asset classes are represented by the following indices: Large Cap Stocks—S&P 500; Mid Cap Stocks—S&P MidCap 400; Small Cap Stocks—Russell 2000; High Yield Corp Bonds—Bbg US Corp High Yield; International Stocks—MSCI World Ex US; Long-Term Corp Bonds—Bbg US Long Credit; Interm-Term Corp Bonds—Bbg US Interm Credit; Long-Term Treasury Bonds—Bbg US Long Treasury; Short-Term Bonds—Bbg US Gov/Credit 1-3Y; Ultra Short-Term Bonds—ICE BofA US 6M Trsy Bill; Cash Equivalents—ICE BofA US 3M Trsy Bill.

-11-

equivalents. Among all ESOPs with more than 100 participants at year-end 2022,[7] the median cash holding was less than 0.10% of total plan assets. In contrast, the ESOP is more than 10% cash equivalents, plus another 11% in short-term treasuries that are functionally similar to cash.

56.     When ESOPs accumulate significant OIA balances through excess cash contributions and dividends, prudent fiduciaries develop an appropriate investment strategy for the OIA funds that is suited to the time horizon over which the plan expects to hold those funds.

57.     In many cases, fiduciaries have taken large stock positions in their OIAs, both through pooled stocks funds and separate accounts managed by professional asset managers. Either approach gives the plans exposure to many individual stocks, which reduces specific risk associated with company stock and provides the best opportunity for long-term capital appreciation using OIA funds.

58.     This prudent conduct is observed in ESOPs with large OIA balances and in ESOPs with small OIA balances.

59.     An example of a fiduciary adopting a long-term capital appreciation strategy for OIA funds in a large plan is the Great Lakes Cheese Co., Inc. Employee Stock Ownership Plan. The Great Lakes Cheese ESOP invests around 98% of its $80 million OIA balance in stocks through an account with a professional asset manager.

60.     A smaller plan that has taken a large stock position with OIA funds is the First American Bank Corporation Employee Stock Ownership Plan. The First American Bank ESOP invests around 98% of its $12 million OIA balance in stocks through registered mutual funds and exchange traded funds.

---

[7] 2022 is the most recent year for which full financial reports of the ESOP and most other employee benefit plans are available from the Department of Labor. Only plans with more than 100 participants are required to file detail financial reports that distinguish cash equivalents from other assets.

-12-

61.     Employee stock plans that have around the same or smaller OIA balances as the ESOP have also taken large stock positions using OIA funds. The Minnesota Elevator, Inc. Employee Stock Ownership Plan invests around 73% of its $8.7 million of OIA funds in stocks through an account with a professional asset manager. The Westar Bank Holding Company, Inc. Employee Stock Ownership Plan invests around 72% of its $5.5 million of OIA funds in stocks through registered mutual funds. The Riverside Construction Company, Inc. Employee Stock Ownership Plan invests around 69% of its $5.3 million of OIA funds in stocks through registered mutual funds. The Ewing-Foley, Inc. Employee Stock Ownership Plan invests around 63% of its $5.7 million of OIA funds in stocks through registered mutual funds and exchanged traded funds. The Oil Well Service Co. Employee Stock Ownership Plan invests around 60% of its $6.1 million of OIA funds in stocks through an account with a professional asset manager.

62.     Defendant's allocation of 100% of the OIA balance to cash equivalents and short-term treasuries is substandard among fiduciaries managing similar OIA balances under similar circumstances. In 2022, there were 31 ESOPs that invested primarily in company stock (50%-90%), do not take participant contributions, and held between $5 million and $10 million in OIA funds throughout the year.[8] In this group, the median allocation of OIA assets to cash and short-term treasuries was only 19%. All but 6 of the other plans invested OIA funds in stocks, with the median such allocation being 47%. While precise circumstances and time horizons are expected to vary, producing a range of allocations between asset classes, Defendant is far outside the norm in leaving the entire OIA balance in short-term, low growth assets.

---

[8] This analysis is based on complete asset schedules filed with the Department of Labor and is therefore also limited to plans with more than 100 participants that timely filed their asset schedules.

-13-

### *Inferences Regarding Defendant's Process*

63.     Based on the foregoing, it reasonable to infer—and Plaintiff therefore alleges—that Defendant failed to engage in a prudent process to investigate and structure an appropriate investment strategy for the OIA. Among other things, Defendant appears to have failed to consider how long OIA funds would be held; whether participants had accumulated sufficient assets for retirement; the differential in long-term average returns between various asset classes; or how to best manage risks such as the specific risk posed by the ESOP's concentration in APP stock.

64.     It is also reasonable to infer—and Plaintiff further alleges—that Defendant was guided by improper, self-serving considerations concerning OIA investments. Holding a large OIA balance benefits APP because the company can use the OIA as a backup reserve to satisfy its long-term liability to repurchase shares from departing participants. The company and its non-ESOP shareholders also obtain tax benefits when the company transfers assets to the OIA.

65.     While both the company and ESOP participants benefit from having a large OIA balance, their interests diverge concerning the appropriate investment strategy. Participants want the OIA to appreciate over the long term, as participants take those increases with them when they leave the ESOP. APP, on the other hand, is interested in the OIA only as a matter of liability management. APP does not receive any benefit from generating excess funds through investment earnings.

66.     Defendant's OIA investment strategy implies that Defendant viewed the OIA from the company's perspective and not participants' perspective, in violation of ERISA.

### *Losses to the ESOP*

67.     The ESOP earned around $80,000 on OIA investments between April 2018 and year-end 2022. Had the OIA been invested in a fund that tracks a major stock market index such as the Vanguard Institutional Index Fund during the same

-14-

period, it would have earned around $3.1 million. Had the OIA been invested in a typical fund that invests in a mix of stocks and other assets such as the Vanguard Wellington Fund (around 65% stocks and 35% bonds and short-term assets), it would have earned around $1.9 million.[9]

68.    The ESOP's losses have likely increased since year-end 2022. If Defendant kept the OIA's investment mix about the same, the OIA earned around 5.6% from the start of 2023 through May 2024 (cumulative). The Vanguard Institutional Index Fund earned 37.5% during this period, and the Vanguard Wellington Fund earned 25.34%. If the OIA balance remained about the same, the OIA's underperformance relative to these widely accepted capital appreciation strategies generated between $1.7 million and $3.3 million in additional losses to the ESOP from the start of 2023 through May 2024.

69.    The ESOP is likely to incur additional losses in the future, so long as Defendant continues to fail in investigating and structuring a prudent investment strategy for the OIA.

### PLAINTIFF'S LACK OF ACTUAL KNOWLEDGE

70.    Until shortly before filing this action, Plaintiff lacked knowledge of material information to support his claims. Among other things, he lacked knowledge of the amount of cash held by the ESOP. He lacked knowledge that the company was using the cash balances held by the ESOP to repurchase shares from departing employees. He also lacked knowledge of the conduct of similarly situated ESOP fiduciaries responsible for investing the non-employer stock portion of their plans. He lacks actual knowledge of Defendant's process for selecting and monitoring OIA

---

[9] The Vanguard Institutional Index Fund and Vanguard Wellington Fund are just two examples of pooled funds commonly selected by retirement plan fiduciaries to pursue capital appreciation objectives. There are hundreds of other alternative funds that invest in stocks, or a mix of stocks and other assets, that would been more appropriate for the OIA than a 100% cash and short-term bond portfolio and dramatically outperformed the OIA during the relevant time.

-15-

investments and has no means to access information related to Defendant's process until discovery commences. Plaintiff's allegations are based on inferences drawn from the facts adduced to date and are made upon information and belief and in reliance on the investigation of counsel.

## PLAN-WIDE RELIEF

71.   29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the ESOP to bring an action on behalf of the ESOP to obtain for the ESOP the remedies provided by 29 U.S.C. § 1109(a). Plaintiff seeks recovery on behalf of the ESOP pursuant to this statutory provision.

72.   Plaintiff seeks recovery for injuries to the ESOP sustained as a result of fiduciary breaches and seeks equitable relief on behalf of the ESOP as a whole pursuant to 29 U.S.C. §§ 1109(a), 1132(a)(2)-(3).

73.   Plaintiff is adequate to bring this derivative action on behalf of the ESOP, and his interest is aligned with other participants and beneficiaries. Plaintiff does not have any conflicts of interest with any participants or beneficiaries that would impair or impede his ability to pursue this action. Plaintiff has retained counsel experienced in ERISA litigation and intends to pursue this action vigorously on behalf of the ESOP.

## CLASS ACTION ALLEGATIONS

74.   Plaintiff additionally and alternatively seeks certification of this action as a class action pursuant to Fed. R. Civ. P. 23.

75.   Plaintiff asserts his claims on behalf of a class of participants and beneficiaries of the ESOP defined as follows:

> All participants and beneficiaries of the ESOP since the date that is six years prior to the filing of this action.

76.   Numerosity: The Class is so numerous that joinder of all Class members is impracticable. The ESOP had hundreds of participants during the relevant period.

-16-

77.    Typicality: Plaintiff's claims are typical of the Class members' claims. Like other Class members, Plaintiff was an ESOP participant and Plaintiff suffered injuries as a result of Defendant's violations of ERISA. Defendant treated Plaintiff consistently with other Class members with regard to the ESOP. Defendant's improper actions affected all ESOP participants similarly.

78.    Adequacy: Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff's interests are aligned with the Class that he seeks to represent, and he has retained counsel experienced in complex class action litigation, including ERISA litigation. Plaintiff does not have any conflicts of interest with any Class members that would impair or impede his ability to represent such Class members.

79.    Commonality: Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members, including but not limited to:

      a.    Whether Defendant was a fiduciary with respect to the ESOP and the scope of its fiduciary duties;

      b.    Whether Defendant failed to comply with the ERISA fiduciary standards of prudence and loyalty in violation of 29 U.S.C. § 1104(a)(1);

      c.    Whether Defendant invested ESOP assets for the benefit of the company, a party in interest the ESOP, in violation of 29 U.S.C. § 1106(a);

      d.    The proper form of equitable and injunctive relief; and

      e.    The proper measure of monetary relief.

80.    Class certification is appropriate under Fed. R. Civ. P. 23(b)(1)(A) because prosecuting separate actions against Defendant would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendant.

-17-

81.    Class certification is also appropriate under Fed. R. Civ. P. 23(b)(1)(B) because adjudications with respect to individual Class members, as a practical matter, would be dispositive of the interests of the other persons not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests. Any award of equitable relief by the Court, such as disgorgement of proceeds of the prohibited transactions and allocation of the proceeds to participants, would be dispositive of the interests of all participants.

82.    Class certification is also appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Class predominate over any questions affecting only individual Class members, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Defendant's conduct as described in this Complaint applied uniformly to all members of the Class. Class members do not have an interest in pursuing separate actions against Defendant, as the amount of each Class member's individual claims is relatively small compared to the expense and burden of prosecuting claims of this nature. Class certification also will obviate the need for unduly duplicative litigation that might result in inconsistent judgments concerning Defendant's actions. Moreover, management of this action as a class action will not present any likely difficulties. In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all Class members' claims in a single forum.

83.    Plaintiff and his undersigned counsel will provide notice to the class to the extent required by Fed. R. Civ. P. 23(c)(2) and the Court.

## **COUNT I**

### **29 U.S.C. § 1104(a)(1)**

84.    Plaintiff incorporates the foregoing paragraphs by reference.

85.    Defendant is the ESOP fiduciary with discretion concerning how the ESOP assets contained within the OIA are invested.

-18-

86.    Defendant violated ERISA fiduciary standards set forth in 29 U.S.C. § 1104(a)(1) by failing to prudently invest the OIA in a manner consistent with the investment objectives of the ESOP and its participants, and by allowing company interests to dictate its investment strategy.

87.    Defendant's violation of 29 U.S.C. § 1104(a)(1) caused the ESOP injury in the form of lost investment earnings, and Defendant's deficient fiduciary conduct threatens future harm to the ESOP of the same character. These injuries to the ESOP adversely affected and continue to affect Plaintiff's ESOP account.

88.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2)-(3), Plaintiff, the ESOP, and the Class are entitled to recover losses caused by Defendant's violation of 29 U.S.C. § 1104(a)(1) and other equitable and injunctive relief.

## COUNT II

## 29 U.S.C. § 1106(a)

89.    Plaintiff incorporates the foregoing paragraphs by reference.

90.    Defendant is the ESOP fiduciary with discretion concerning how the ESOP assets contained within the OIA are invested.

91.    The company, APP, is a "party in interest" to the ESOP pursuant to 29 U.S.C. § 1002(14)(C) because its employees are the ESOP's participants.

92.    Defendant violated 29 U.S.C. § 1106(a)(1)(D) by using the OIA funds for the benefit of APP by pursuing a heavily conservative investment strategy designed to preserve the principal balance of the OIA for the purpose of relieving APP from its obligation to repurchase shares when employees request a distribution from the ESOP.

93.    Defendant's violation of 29 U.S.C. § 1106(a) caused the ESOP injury in the form of lost investment earnings, and Defendant's deficient fiduciary conduct threatens future harm to the ESOP of the same character. These injuries to the ESOP adversely affected and continue to affect Plaintiff's ESOP account.

-19-

94.     Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2)-(3), Plaintiff, the ESOP, and the Class are entitled to recover losses caused by Defendant's violation of 29 U.S.C. § 1106(a) and other equitable and injunctive relief.

**PRAYER FOR RELIEF**

95.     Wherefore, Plaintiff prays for judgment against Defendant and for the following relief:

A.     Certify Plaintiff's authority to seek plan-wide relief on behalf of the ESOP pursuant to 29 U.S.C. § 1132(a)(2);

B.     Alternatively, certify this action as a class action pursuant to Fed. R. Civ. P. 23, certify Plaintiff as the class representative, and certify his counsel as class counsel;

C.     Order Defendant to make good to the ESOP all losses resulting from its violations of ERISA;

D.     Impose equitable and injunctive relief sufficient to protect ESOP participants, including changes to Defendant's investment process and/or appointment of independent investment advisors and managers;

E.     Award Plaintiff reasonable attorneys' fees and costs incurred pursuant to 29 U.S.C. § 1132(g), and/or pursuant to the common fund method;

F.     Award prejudgment and post-judgment interest; and

G.     Award such other and further relief as the Court deems just and equitable.

Respectfully Submitted,

ENGSTROM LEE LLC

DATED: June 28, 2024           /s/ *Charlie C. Gokey*

-20-

Charles C. Gokey, CA Bar No. 295610
cgokey@engstromlee.com
323 N Washington Ave., Suite 200
Minneapolis, MN 55401
Telephone: (612) 305-8349
Facsimile: (612) 677-3050

*Counsel for Plaintiff*

-21-